IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**NICOLETTE PAGE**, an individual,

        Plaintiff,

    v.

**WALGREEN CO. dba WALGREENS**, a
foreign corporation,

        Defendant.

_____

No. 6:24-cv-16-MC

**OPINION AND ORDER**

**MCSHANE, Judge**:

Plaintiff Nicolette Page brought this discrimination action against Defendant Walgreens, alleging that Defendant barred Plaintiff from its store on account of Plaintiff's race. Her case was fabricated. Once Plaintiff had to disclose information related to alleged witnesses, large cracks in her story appeared. Later depositions confirmed that Plaintiff had lied about important aspects of this tale and solicited perjury from at least two purported witnesses.

Defendant moved for sanctions. Mot. Sanctions, ECF No. 50. Plaintiff is liable for all fees and costs Defendant incurred defending this made-up case.[1] And because Plaintiff's attorneys failed in their duty to conduct a reasonable investigation into the veracity of Plaintiff's ever–changing story, the attorneys are joint and severally liable for all fees and costs incurred by Defendant after April 24, 2025.

---

[1] At the hearing on Defendant's Motion for Sanctions, the Court dismissed the case, with prejudice. Despite being ordered to appear in-person for that hearing, Plaintiff chose not to appear.

1 – OPINION AND ORDER

**BACKGROUND**

Plaintiff alleged that on October 23, 2023, while shopping at a Walgreens in Keizer, Oregon, she entered the store's bathroom with her daughter and her daughter's friend. Second Am. Compl. ("SAC") ¶¶ 5– 6, ECF No. 26. "Unbeknownst to Ms. Page, the family friend's daughter had stolen a pregnancy test kit[.]"[2] SAC ¶ 7.

The following day, Plaintiff returned to the store. SAC ¶ 8. The store's manager approached Plaintiff "by coming within inches of her and aggressively telling her 'I'm going to have to ask you to leave.'" SAC ¶ 8. Plaintiff was shocked and responded by saying "What!? Why!?" SAC ¶ 9. The manager stated, "We have you on camera stealing from the store." SAC ¶ 10. Plaintiff denied stealing anything and the manager stated, "We have you on video" and accused Plaintiff of stealing a pregnancy test kit. SAC ¶ 11–12. After some back and forth, the manager "reiterated his demand that [Plaintiff] leave the store and threatened her with physical force, stating in an elevated voice "You are not going to be getting anything here. You need to leave now or I will help you to leave." SAC ¶ 15. Fearing for her physical safety, Plaintiff left the store. SAC ¶ 16.

The day after being ordered to leave the store, Plaintiff called and left a message for the store's general manager "stating in no uncertain terms that she had not stolen anything and that she had been humiliated by being falsely accused of theft and forced to leave the store." SAC ¶ 17. The general manager called Plaintiff the following day to apologize "and explained that she had reviewed the video recording and that it was clear that [Plaintiff] had not stolen anything, but that her family friend's daughter had."[3] SAC ¶ 18. The general manager commented that this "is

---

[2] The Court includes allegations from the Second Amended Complaint solely for context, and not to imply that the allegations are true. Piecing together parts of multiple depositions that were less-than credible, it appears that Plaintiff herself stole the pregnancy test kit. *See* Barrett Decl. Ex. 1 at 2–3, Ex. 21 at 6–7; ECF No. 52. What is clear, however, is that Plaintiff's allegations of racial discrimination were pure fiction.

[3] Discovery established that Plaintiff's version of this phone call was almost certainly fabricated. The cameras in Defendant's stores did not record either the specific area of the theft or the bathrooms. Unsurprisingly, Defendant's

2 – OPINION AND ORDER

not how our employees are trained" and explained the night manager "needed more training." SAC ¶ 21.

Plaintiff filed this diversity action bringing state claims for racial discrimination, negligent training, and defamation.[4] Plaintiff sought $1.5 million in noneconomic damages from "significant fear, humiliation[,] and embarrassment" and also sought punitive damages. SAC ¶ 34.

## STANDARDS

Dismissal of an action, although a drastic remedy, is appropriate when a party fabricates claims and "undermine[s] the integrity of judicial proceedings." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). "Like all other litigants, civil rights litigants face the prospect of sanctions if they pursue patently frivolous lawsuits." *Park v. State ex. rel. Dep't of Corrections*, 257 Or. App. 553, 563 (2013) (quoting *Blue v. U.S. Dep't of Army*, 914 F.2d 525, 534 (4th Cir. 1990)). And even if a plaintiff pleads a *prima facie* case, they may be liable for attorney fees "if the discovery process makes it apparent that the plaintiff's claim is patently frivolous, yet the plaintiff continues the litigation." *Id.* at 562.

Courts have the inherent authority to sanction an attorney for certain discovery violations or for willfully abusing the judicial process. *Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon Ltd. Partnership*, 76 F.3d 1003, 1007 (9th Cir. 1996). Under Federal Rule of Civil Procedure 26(a), a party is required to disclose the name, address, and telephone number of any person who is likely to have discoverable information. If a party later learns that the information above may be incorrect, the party must supplement or correct that information. Fed. R. Civ. P. 26(e)(1). Any party who fails to disclose or supplement a potential witness under rule 26(a) may

---

[4] manager denied telling Plaintiff that cameras confirmed that Plaintiff had not stolen anything. Barrett Dec. Ex. 1 at 4–5.
[4] The Court dismissed Plaintiff's False Arrest claim with prejudice. July 31, 2024, Op. & Order, ECF No. 22.

be liable for "payment of the reasonable expenses, including attorney's fees, caused by the failure." Fed. R. Civ. P. 37(c)(1).

Additionally, under Oregon law, a party may be liable for attorney fees if "there was no objectively reasonable basis for asserting the claim[.]" ORS 20.105(1). "A claim lacks an objectively reasonable basis only if it is entirely devoid of legal or factual support, either at the time it is made or, in light of additional evidence or changes in the law, as litigation proceeds." *Williams v. Salem Women's Clinic*, 245 Or. App. 476, 482 (2011) (cleaned up).

## DISCUSSION

Because Plaintiff fabricated her claims and suborned perjury from other individuals to pursue this action, this case is DISMISSED, with prejudice. *Leon*, 464 F.3d at 958. For the same reason, Plaintiff is liable for all fees and costs Defendant incurred in defending this made-up action. *Oregon RSA No. 6, Inc*, 76 F.3d at 1007.

Additionally, as demonstrated below, Plaintiff's attorneys had a duty, at some point, to make a more robust analysis into assuring the veracity of the information provided by Plaintiff. Giving Plaintiff's attorneys every benefit of the doubt, the Court concludes that that duty attached on April 24, 2025. On that day, defense counsel sent Plaintiff's attorneys a detailed, five-page letter outlining the results of their own investigation into Plaintiff's evolving story. Barrett Decl. Ex. 16. Instead of making even a token inquiry as to the credibility of Plaintiff's story, Plaintiff's attorneys chose instead to double down, filing a frivolous motion to compel production of all video evidence from the store. Had Plaintiff's attorneys instead devoted but a fraction of their time making basic inquiries of their client, they would have determined that her story was not credible.

4 – OPINION AND ORDER

Therefore, Plaintiff's attorneys are joint and severally liable for all fees and costs incurred by Defendant after April 24, 2025.[5]

In October 2024, Defendant asked Plaintiff to identify the "family friend's daughter" who, according to Plaintiff, stole the pregnancy test kit. Plaintiff identified the individual as Amara but refused to provide Amara's contact information and claimed to not know Amara's last name.

Defendant immediately released all video evidence from the store's cameras to Plaintiff's counsel from the dates specified in the Complaint. On November 15, 2024, defense counsel emailed Plaintiff's attorney, noting that now that Plaintiff's attorney had been able to review store footage of the alleged dates at issue, "There is another side of this whole story, and one piece of this is that, contrary to what your client has told you that she was told, there was never any video." Barrett Decl. Ex. 2, ECF No. 52.

Rather than respond to Defendant's request to review the video footage and align that with Plaintiff's claims, Plaintiff's attorneys simply ignored the video evidence. Remarkably, Plaintiff's attorneys appear to have not even so much as skimmed the video. As noted above, if the attorneys had reviewed the footage, they would have learned that no cameras covered the specific areas of the store mentioned in the Complaint; i.e., the aisle with the pregnancy kits or the bathroom. Plaintiff's counsel should have inquired of Plaintiff about her claim that the store manager told Plaintiff that she had reviewed the footage and stated that it clearly showed the family friend stealing the pregnancy test. Again, Plaintiff's attorney simply ignored the video evidence.[6]

---

[5] A strong argument could be made that this duty arose one month earlier, after Plaintiff's daughter, L.L. sat for a deposition. Given the unusual nature of the deceit here, however, the Court errs on the side of caution and finds Defendants' detailed letter at exhibit 16 raised enough red flags to put Plaintiff's attorneys on notice that, as the Court mentioned at oral argument, "there was a skunk in the room."

[6] The Court makes this presumption because in January 2025, months after Defendant turned over the video evidence, Plaintiff's counsel asked Defendant to refresh the link containing the video evidence.

5 – OPINION AND ORDER

In his declaration, Plaintiff's attorney states, "From the beginning of this case, Mr. Lundberg and I sought to obtain surveillance video of both encounters that Ms. Page had with Walgreens staff." Malmsheimer Decl. ¶ 9. The attorney then notes that Defendant "only ever produced video of the second day, stating that video of the first day had been overwritten." Malmsheimer Decl. ¶ 9. The reason that Defendant deleted any video from the day of the theft, however, was because Plaintiff "misremembered the relevant dates" of the incidents. *See* Malmsheimer Jan. 21, 2025, email to the Court. By the time Plaintiff suddenly remembered the correct dates, well over one year after the events at issue, Defendant had overwritten video from the day of the theft. Additionally, although the attorney "sought to obtain video evidence" of the events at issue, he provides no explanation for waiting several months to even review that video evidence. The failure to even skim the video for several months is at odds with the attorney's current admission that the "video evidence is a critical component of this case" and is "central to the dispute." *See* Malmsheimer Jan. 21, 2025, email to the Court. Counsel exhibited the same blasé attitude when faced with mounting inconsistencies in Plaintiff's story.

In January 2025, the parties disagreed on whether Plaintiff had to disclose additional contact information for Amara. The Court noted Plaintiff's obligation to produce contact information of any potential witness and ordered Plaintiff to disclose all known contact information regarding Amara. ECF No. 33. Plaintiff then provided Defendant a phone number for an individual named Jenny Martinez. Plaintiff's attorneys did not comment on why this critical witness's name had suddenly changed from Amara to Jenny Martinez. There is no indication that Plaintiff's attorneys ever so much as questioned Plaintiff as to how she got this important witness's name incorrect. These were the formations of small cracks in Plaintiff's tale that soon ballooned to huge fissures undermining Plaintiff's entire case. Fissures Plaintiff's attorneys ignored.

6 – OPINION AND ORDER

When Defendant called the number Plaintiff provided for Jenny Martinez, the individual who answered identified herself as Nora. Nora stated that the number was not Jenny Martinez's number but indicated Jenny Martinez lived with Nora.

Defendant deposed Plaintiff on February 6, 2025. Plaintiff stated that Jenny Martinez was her daughter's friend who stole the pregnancy test. Barrett Decl. Ex. 10 at 31. Plaintiff stated that her daughter L. and Amara were also in the store when Jenny Martinez stole the test.[7] Plaintiff said that she, L., and Jenny Martinez went into the bathroom together. Plaintiff learned about the theft later that night, when she overheard a FaceTime between L., Jenny Martinez, and Amara. On that call, according to Plaintiff, Jenny Martinez admitted to stealing the pregnancy test. Plaintiff said that L. was also present the following day, when Plaintiff attempted to return to the store but was refused service.

Plaintiff also stated that her daughter L. told Plaintiff that Jenny Martinez lived with a friend, Nora. According to Plaintiff, L. and Jenny Martinez were still friends and communicated via FaceTime. Plaintiff said that she said hello to Jenny Martinez three weeks before the deposition, when L. was on FaceTime with Jenny Martinez.

On February 24, 2025, defense counsel emailed Plaintiff's attorneys, pointing out that Defendant "still lack[s] basic witness contact information." Barrett Decl. Ex. 11. In that email, Defendant noted that initially, "Jenny Martinez was not identified as a witness at all, even though Ms. Page attributes the theft to Jenny and Jenny would be a key witness to Ms. Page's alleged innocence. Instead of Jenny, Ms. Page identified a person named 'Amara' as a witness, but no

---

[7] Although Plaintiff testified in her deposition that her daughter, L., was with in the store with her the day of the theft, this is different than what Plaintiff told her counsel on January 13, 2025, when she stated, "The day the crime was committed, it was me and my stepdaughter going to the store[.]" Malmsheimer Decl. Ex. 3. In that email, Plaintiff told her attorney that L. was with her the following day, when Plaintiff was told to leave the store. The Court disagrees with Plaintiff's attorneys' opinions that these are mere minor inconsistencies.

contact information for Amara was provided." Barrett Decl. Ex. 11. Defendant also pointed out that the number Plaintiff provided for Jenny Martinez was answered by Nora, who stated she knew Jenny Martinez but confirmed the number was not, in fact, Jenny Martinez's number. The email also pointed out that the Complaint indicated the family friend who stole the test kit "was a skinny Caucasian girl with red hair and correspondingly fair complexion, but [Plaintiff] testified that Jenny is at least part-Hispanic, has a tan or has a tan look, and her hair is not naturally red." Barrett Decl. Ex. 11.

The parties conferred and Defendant sent Plaintiff's attorneys another email on February 28, 2025. In that email, Defense counsel stated:

> As I told you last year: There never was a camera that would have captured the theft of a pregnancy kit at the Keizer Walgreens. You now have the evidence, including a store plan, the camera locations, and the camera views. I realize your client has claimed that Walgreens employees told her that either she or Jennifer Martinez was on camera having stolen the pregnancy test kit. She has not been forthcoming with you on this and other issues.

Barrett Decl. Ex. 12.

Rather than acknowledge that Plaintiff had: (1)  initially stated Amara was the individual who stole the test kit before stating, months later, that Jenny Martinez stole the kit; (2) provided a number for Jenny Martinez that was not Jenny Martinez's number; and (3) stated an employee said a camera captured the theft despite objective evidence demonstrating that no camera captured either of the two areas critical to Plaintiff's case, Plaintiff's attorney merely informed Defendant that "Ms. Page has been as honest as the day is long with us." Barrett Decl. Ex. 12. As noted above, Plaintiff had also changed her story regarding whether her daughter, L., or her step-daughter, A.N., was with her on the day of the theft.

On March 13, 2025, Plaintiff's attorney provided Defendant with a second phone number for Jenny Martinez. Plaintiff's counsel didn't provide any reason for the need for the new number

and did not indicate any concern with the accuracy of information provided by Plaintiff.[8] The following day, Defendant called the number and reached someone who stated that she was Jenny Martinez. This individual soon hung up and did not answer other calls from Defendant.

Defendant deposed Plaintiff's daughter, L., on March 27, 2025. Although Plaintiff stated that she had said hello to Plaintiff on L.'s FaceTime roughly two months prior, L. stated that she had not communicated with Jenny Martinez in a year or two. Barrett Decl. Ex. 14. L. stated that she did not use FaceTime and usually would just text or call friends. In contrast to her mother's statements, L. said that Jenny Martinez stole the pregnancy test on the same visit that Defendant's employee asked Plaintiff to leave the store. Additionally, L. stated that Jenny Martinez put the pregnancy test in her bag and was walking to the bathroom when the store employee told Plaintiff to leave the store. L stated that she did not go into the bathroom with Jenny Martinez. L. stated that she did not know anyone named Amara and that she did not think that Jenny Martinez ever told L. that she had stolen the test kit (although Jenny may have admitted that during the car ride home). L. did not have contact information for Jenny Martinez or Amara on her phone or on any applications like Snapchat, WhatsApp, or FaceTime.

Plaintiff's former attorneys say that the differences between Plaintiff's and L.'s deposition testimony were only minor inconsistencies that did not raise any red flags. The Court disagrees. Plaintiff explicitly stated (and alleged) that the theft occurred on one visit and the interaction with Defendant's employee occurred the following day. Plaintiff's daughter, however, stated the two events occurred during the same visit. Additionally, while Plaintiff stated all three individuals went

---

[8] Although this much should be obvious, the Court emphasizes the fact that the information Plaintiff provided first for Amara and later for Jenny Martinez was not ancillary information only tangentially related to Plaintiff's claims. Instead, this information was for the key witness supposedly supporting Plaintiff's claims. That Plaintiff changed this crucial witness's name should have raised a giant red flag for Plaintiff's counsel. Instead, Plaintiff's attorneys chose to bury their heads in the sand, ignoring the myriad inconsistencies in Plaintiff's accounting and, at least on this record, never even question Plaintiff about her version of events.

9 – OPINION AND ORDER

to the restroom together, L. stated the three individuals never went into the bathroom together. Additionally, while Plaintiff stated she had said hello to Jenny Martinez while L. was on FaceTime with L. approximately three weeks earlier, L. stated that she had not communicated with Jenny Martinez in a year or so (and generally did not even use FaceTime).

In early April 2025, Defendant hired a private investigator to obtain more information about Jenny Martinez. The investigator found an address for Nora (the individual who answered Defendant's call to the first number Plaintiff provided for Jenny Martinez) and Nora confirmed that the first telephone number provided by Plaintiff was her telephone number. Nora also told the investigator that another individual, A.N., stayed at Nora's home. A.N. confirmed that the second telephone number provided by Plaintiff was her number. Remarkably, A.N. had the same name as Plaintiff's 17-year-old stepdaughter. Unsurprisingly, Plaintiff's attorneys did not appear to catch this fact and there is nothing in this record indicating the attorneys ever asked Plaintiff anything close to this very obvious question: "Why does the phone number you provided for Jenny Martinez belong to your stepdaughter, A.N.?"

On April 24, 2025, Defendant provided a detailed letter laying out all of the above information, pointing out the inconsistencies in Plaintiff's story and the information provided, and informed opposing counsel that they would seek sanctions. Conferral on Defendant's letter revealed that Plaintiff's attorneys had only spoken to Plaintiff and L. and had never spoken to Amara or Jenny Martinez and did not know whether either individual existed. Barrett Decl. Ex. 17, Ex. 20. Regarding changing the critical witness's name from Amara to Jenny Martinez, Plaintiff's attorney simply assumed that Plaintiff was confused and got her daughter's friends' names mixed up. Rather than ask Plaintiff tough questions regarding the validity of the constantly changing information she provided, and rather than attempt to contact any witness other than

Plaintiff or L., Plaintiff's attorneys chose to immediately file a frivolous motion for a site inspection of Defendant's store. If Plaintiff's attorney's put in a fraction of the effort they expended drafting the frivolous motion into piecing together the pieces outlined in Defendant's April 25, 2025, letter, they would have moved to withdraw one month before they ultimately moved to withdraw. They would have discovered that their client was not credible and had fabricated critical pieces of her case. Defendant would not have been forced to depose other witnesses (who ultimately confirmed that Plaintiff had asked them to commit perjury in this action).[9] Specifically, N.T. stated that she overheard a FaceTime where Plaintiff asked her step-daughter, A.N. to go by Jenny Martinez. A.N. later revealed that Plaintiff asked her to go by Jenny Martinez to support her baseless claims against Defendant.

There is no question that Plaintiff lied to her attorneys. At the same time, there is no question that based on Plaintiff's representations, her attorneys were clearly authorized to file this action based on their initial discussions with Plaintiff. But "a party has a continuing duty to evaluate its position throughout the course of litigation. It is possible that a claim that was objectively reasonable may become unreasonable when viewed in light of additional evidence or changes in the law." *Dimeo v. Gesik*, 197 Or. App. 560, 562 (2005). Plaintiff's attorneys here erred not in representing Plaintiff in the first place, but in failing to conduct any investigation at all as evidence of Plaintiff's lies multiplied. The attorneys admit that they never spoke with any witness other than Plaintiff and her daughter. They went months without even reviewing the video evidence provided by Defendant (which revealed additional holes in Plaintiff's version of events).

---

[9] As noted above, Defendant's private investigator confirmed that the second phone number Plaintiff provided for Jenny Martinez belonged not to anyone named Jenny Martinez, but to Plaintiff's 17-year-old stepdaughter. In the April 24, 2025, letter, defense counsel confirmed that he had informed Plaintiff's counsel that he "intended to serve a deposition subpoena on [Plaintiff's stepdaughter]. In the three days since I provided that notice, despite that neither party disclosed [A.N., the stepdaughter] as a relevant witness in this matter, you have not asked who she is or what connection she has to this case." Barrett Decl. Ex. 16, 5. This serves as an adequate example of Plaintiff's attorneys' general indifference to the "skunk in the room."

11 – OPINION AND ORDER

They did not question why Plaintiff suddenly provided a different name for her key witness. They did not question the large, material discrepancies in the deposition testimony of the only two witnesses they had spoken to; i.e., Plaintiff and her daughter. They ignored additional inconsistencies obtained through Defendant's investigator and appeared not even to grasp that the second number Plaintiff provided belonged not to Jenny Martinez, but to Plaintiff's stepdaughter. Each of the above may appear to be mere mole hills. But when viewed as a whole, they reveal a mountain of inconsistencies. There is no doubt that their actions, at some point, crossed the line of reasonable conduct. Giving the attorneys the benefit of the doubt, they crossed that line no later than April 25, 2025, when they ignored the summary of the inconsistencies of Plaintiff's statements and, instead of questioning their client, filed a frivolous motion for a site inspection.

## CONCLUSION

For the above reasons, Defendant's Motion for Sanctions, ECF No. 50, is GRANTED. This action is DISMISSED, with prejudice. Plaintiff is liable for any costs and fees incurred by Defendant in defending Plaintiff's fabricated claims. Plaintiff's former attorneys are jointly and severally liable for any fees or costs incurred by Defendant as of April 24, 2025. Defendant is not required to confer with Plaintiff on any motion for fees. Defendant, however, is ordered to confer with Plaintiff's former attorneys on any motion for fees and costs. Only if the parties are unable to reach an agreement shall Defendant file the motion as to opposing counsel. If the Court is required to resolve any fee dispute between the attorneys, the Court will take the parties' relative reasonableness during the conferral process under consideration when resolving the motion.

IT IS SO ORDERED.

DATED this 2nd day of June 2026.

_____/s/ Michael McShane_____
**Michael J. McShane**
**United States District Judge**

12 – OPINION AND ORDER